[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 473.]

CAMPBELL SOUP COMPANY, APPELLANT AND CROSS-APPELLEE, *v.* TRACY,

TAX COMMR., APPELLEE AND CROSS-APPELLANT.

[Cite as *Campbell Soup Co. v. Tracy*, 2000-Ohio-389.]

*Taxation—True value of personal property—Application of 302 Computation in depreciating soup plant machinery and equipment and juice plant machinery and equipment.*

(No. 99-120—Submitted March 8, 2000—Decided May 24, 2000.)

APPEAL and CROSS-APPEAL from the Board of Tax Appeals, No. 96-S-1246.

———————————

{¶ 1} Campbell Soup Company, appellant and cross-appellee, prepares, slices, and blends ingredients to cook soups and sauces in its soup plant in Napoleon and juices in its beverage plant next door. Campbell built the plants in 1957 and has modernized the plants when practical. It most recently modernized the plants in 1990 through 1996. The modernization included updating and replacing machinery and equipment, and constructing improvements on the real property.

{¶ 2} In preparing Campbell's personal property tax returns for 1989, 1990, and 1991, Campbell valued its equipment with an in-house depreciation table instead of the annual allowances prescribed by the Tax Commissioner, appellee and cross-appellant, in his "302 Computation."

{¶ 3} The commissioner audited Campbell's reports for these tax years. He, ultimately, valued the soup plant machinery and equipment using Class V annual allowances (useful life of between 14.8 and 17.2 years; residual value of 16.3 percent) and the juice plant machinery and equipment using Class IV annual allowances (useful life of between 11.6 and 14.8 years; residual value of 17.4 percent) under his 302 Computation. According to the commissioner's final order, the disposal study submitted to the commissioner by Campbell disclosed that

Campbell held each item disposed for an average of 18.1 years. He concluded that this study supported the allowances prescribed by the 302 Computation.

{¶ 4} The commissioner has adopted the 302 Computation to direct how taxpayers depreciate their personal property for the personal property tax. According to the commissioner's instructions for the 302 Computation, "Ohio Administrative Code (OAC) Rules 5703-3-10 and 5703-3-11 provide for the determination of the true value of tangible personal property used in business. A procedure which applies a composite annual allowance to historical costs has been prescribed by the Tax Commissioner for over sixty years, with modifications to reflect current technology and business experience, new types of equipment, and new business activities. The procedure, often referred to as the 'true value computation' or '302 computation', has been approved by the courts as a means for determining true value for personal property tax purposes."

{¶ 5} Campbell appealed the commissioner's order to the Board of Tax Appeals ("BTA"). At the BTA, Campbell presented testimony and evidence on the condition of the plants and Campbell's efforts to modernize them. It also presented the testimony of John Connolly, an expert appraisal witness who primarily appraises machinery and equipment.

{¶ 6} Connolly prepared an obsolescence study and a lifing study to assist Campbell in determining to which class of the 302 Computation it should assign its equipment and, also, in determining the equipment's residual, or "floor," value.

{¶ 7} For the obsolescence study, Connolly reviewed all capital expenditure projects in excess of approximately $100,000 for 1989 through 1996. Connolly divided the expenditures into three general areas: deferred capital spending, modernization, and government-mandated expenditures. He treated deferred capital spending and modernization as measures of functional obsolescence. Connolly concluded that Campbell's machinery and equipment contained $41,700,000 in functional and governmental obsolescence for tax year 1989,

2

$50,000,000 in functional and governmental obsolescence for tax year 1990, and $40,100,000 in functional and governmental obsolescence for tax year 1991.

{¶ 8} Connolly also studied the economic obsolescence of Campbell's plants. He contrasted the designed capacity of the plants with actual production to determine Campbell's excess capacity. He determined that the excess capacity of the plants required him to apply, to account for economic obsolescence, an inutility penalty of eleven percent for the three tax years.

{¶ 9} Connolly next analyzed Campbell's asset retirements to determine a reasonable useful life for the assets. Based on the data, Connolly generated a matrix that provided a numerical indication of the percent of total capitalized dollars retired and the percent of total capitalized dollars remaining. This matrix covered Campbell's retirement experience from 1988 to the date of the hearing, November 1997. Connolly compared this data for 1988, 1989, and 1990 to the "Iowa type curves." Connolly described the Iowa curves as a mortality table, originally developed in 1935 and re-validated in 1980, that proposes a depreciation curve on how assets have depreciated.

{¶ 10} According to Connolly, for 1988 (tax year 1989) the Iowa curve produced an average life for Campbell's equipment of 13.29 years, for 1989 (tax year 1990) 12.23 years, and for 1990 (tax year 1991) 9.68 years. Connolly also testified that a weighted cost analysis of the data indicated the life of the disposed assets to be 9.6 years. Connolly concluded that Campbell's machinery and equipment had a reasonable useful life of 10 years.

{¶ 11} For his final task, Connolly, in his lifing study, prepared an adjusted disposition schedule to determine the "floor value" of the property. He described the floor as "that magical point in time on the true value tables where an asset no longer loses value. * * * [I]t's that magical point in time when an asset always has value."

**{¶ 12}** Connolly analyzed Campbell's 1992 disposals. For each group of 1992 disposals purchased in a particular year, from 1957 through 1992, Connolly recorded the amount capitalized, applied an index factor to project a cost new, and calculated the ratio of the proceeds from the sale of the assets to the projected cost new. The study disclosed that Campbell received 5.31 percent of the projected cost new as proceeds from sale at disposal. He, accordingly, testified that 5.3 percent was the floor value for Campbell's property.

**{¶ 13}** In addressing this evidence, the BTA, first, found that Campbell's testimony on the inefficiency of its equipment did not establish that it experienced special or unusual circumstances to deviate from the 302 Computation. The BTA found that much of the equipment Campbell used in the taxable years was older equipment that had outlived its useful life set forth in the 302 Computation. The BTA also found that Campbell had not established that its operation of the "equipment was outside the original specifications, the equipment was subjected to working conditions beyond its capacity, or that harsh conditions caused equipment to age more rapidly."

**{¶ 14}** Second, the BTA concluded that Connolly's obsolescence studies did not prove that special or unusual circumstances existed for which the 302 Computation did not account. The BTA rejected all of Connolly's obsolescence measurements. The BTA discounted Connolly's failure to separate asbestos-removal costs related to real property, in the amount of $2,600,000, from total asbestos-removal costs of $7,300,000. The BTA, in addition, found that Connolly had included real property improvements in certain projects when calculating his obsolescence penalty. The BTA, finally, questioned Connolly's including costs for a project that relocated a production line in 1991; the production line was not located at Napoleon during the tax years. The BTA found that these deficiencies rendered Connolly's methodology in determining "his obsolescence penalty to be suspect."

**{¶ 15}** The BTA also found that Connolly's lifing study failed "to accurately establish the actual length of the contested property's useful life." It first found Connolly's "disposal study to be too narrow to be used as justification for the data derived from the Iowa curves." The BTA specifically questioned his considering only disposed assets that sold for other than scrap value, but not considering assets retired during the period in question.

**{¶ 16}** Furthermore, the BTA did not accept the Iowa curves methodology. The BTA found the Iowa curves are "not based on the experience of a particular industry, such as the food processing industry, but rather [are] a tool to be utilized in estimating retirement patterns." The BTA concluded that the 302 Computation better accounted for the useful lives of Campbell's equipment.

**{¶ 17}** The BTA, however, agreed with Connolly that the lifing study did establish a lower residual value for the equipment. The BTA noted that a "floor is required because, conceptually, an item of business property has value to the business as long as it is in service." In this case, the BTA found that the residual floor for Campbell's property should be 5.3 percent, Connolly's figure, because the property had little salvage value.

**{¶ 18}** Campbell appealed the rejection of its testimony and evidence in attempting to modify the application of the 302 Computation; the commissioner appealed the BTA's fixing of Campbell's floor value at 5.3 percent.

**{¶ 19}** This cause is now before the court upon an appeal and cross-appeal as of right.

————————————

*Jones, Day, Reavis & Pogue, Todd S. Swatzler* and *John C. Duffy, Jr.*, for appellant and cross-appellee.

*Betty D. Montgomery*, Attorney General, *James C. Sauer* and *Richard C. Farrin*, Assistant Attorneys General, for appellee and cross-appellant.

————————————

**Per Curiam.**

{¶ 20} We affirm the BTA's decision as to the appeal; we reverse the BTA's decision as to the cross-appeal.

{¶ 21} As to the appeal, Campbell maintains that the BTA misunderstood and misapplied its evidence. Consequently, so it argues, the evidence does not support the BTA's decision, rendering the decision unreasonable and unlawful. The commissioner, in answer, argues that Campbell did not present competent and probative evidence to rebut the presumption of validity that his determination of value possesses.

{¶ 22} Under R.C. 5711.09, the commissioner is to administer the personal property tax laws, adopting and promulgating necessary rules "so that all taxable property shall be listed and assessed for taxation." Under R.C. 5711.21(A), the commissioner is to follow rules and evidence "as will enable the [commissioner] to arrive at such true value."

{¶ 23} Nearly sixty years ago, we approved of the commissioner's method to determine the true value of personal property, the 302 Computation. In *Wheeling Steel Corp. v. Evatt* (1944), 143 Ohio St. 71, 81, 83, 28 O.O. 21, 25, 26, 54 N.E.2d 132, 137, 138, we stated:

"So far as the record in this case discloses, we see no reason for criticism of the application of the so-called '302 Computation' especially as the evidence shows and as appellant admits, it is applied generally to all taxpayers in similar situations. Of course, situations may arise where such computation would not be proper. * * * Percentage depreciation is used almost universally in industry and in accounting.

" * * *

"The '302 Computation' as we understand the record and argument in this case is a rule adopted by [the] former Tax Commission and carried over under the provisions of Section 1464-4, General Code. While it has not been duly

promulgated and filed, we are of the opinion that the use of such rule in the instant cases is within the powers delegated to the Department of Taxation."

{¶ 24} We summarized the reasoning and evidentiary process for valuing personal property under the 302 Computation in *Snider v. Limbach* (1989), 44 Ohio St.3d 200, 201-202, 542 N.E.2d 647, 649:

"Moreover, it is impractical for the commissioner to personally value all personal property in Ohio; thus, she may resort to a predetermined formula to ascertain value. *W.L. Harper Co. v. Peck* (1954), 161 Ohio St. 300, 53 O.O. 178, 118 N.E.2d 643. However, the formula must be adjusted when special or unusual circumstances or conditions of use exist or when evidence shows that rigid application would be inappropriate. *Monsanto Co. v. Lindley* (1978), 56 Ohio St.2d 59, 62, 10 O.O.3d 113, 114, 381 N.E.2d 939, 941. The burden to show that the commissioner's formula does not ascertain true value is met only if the appellant ' * * * introduces competent evidence of probative value of the personal property's true value in money.' *Alcoa v. Kosydar* (1978), 54 Ohio St.2d 477, 481, 8 O.O.3d 459, 462, 377 N.E.2d 785, 788."

{¶ 25} Thus, the commissioner may apply the 302 Computation to value personal property in Ohio. The burden is on taxpayers to show that they may deviate from the computation because special or unusual circumstances or conditions of use exist or because evidence shows that its rigid application would be inappropriate. The BTA errs if it reverses the commissioner's determination without receiving competent and probative evidence that the commissioner's determination of the property's true value is factually incorrect. *Hatchadorian v. Lindley* (1986), 21 Ohio St.3d 66, 21 OBR 365, 488 N.E.2d 145, paragraph two of the syllabus.

{¶ 26} In *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision* (1997), 77 Ohio St.3d 402, 405, 674 N.E.2d 696, 699, we clarified our role in appeals from the BTA. We set forth when we affirm appeals from the BTA:

"Consequently, we affirm the BTA's basic factual findings if sufficient, probative evidence of record supports these findings. We also affirm the BTA's rulings on credibility of witnesses and weight attributed to evidence if the BTA has exercised sound discretion in rendering these rulings. Finally, we affirm the BTA's findings on ultimate facts, *i.e.*, factual conclusions derived from given basic facts, *Ace Steel Baling, Inc. v. Porterfield* (1969), 19 Ohio St.2d 137, 142, 48 O.O.2d 169, 171-172, 249 N.E.2d 892, 895-896, if the evidence the BTA relies on meets these above conditions, and our analysis of the evidence and reading of the statutes and case law confirm its conclusion. After meeting all these prerequisites, the BTA's decision would, thus, be reasonable and lawful, pursuant to R.C. 5717.04."

{¶ 27} In this case, Campbell asserts that the BTA misunderstood and misapplied its evidence. We disagree. The BTA pointed out in clear terms the problems it had with Campbell's evidence. As for the obsolescence study, the BTA observed that the 302 Computation considers obsolescence but that Connolly's report did not establish special or unusual circumstances to alter the commissioner's application of the 302 Computation. The BTA declined to give Connolly's report any weight or Connolly any credibility. The BTA pointed out faults in his report and questioned Connolly's judgment in ignoring these faults and in stating they had a minimal impact on his calculations.

{¶ 28} As to the lifing study, the BTA found that the study failed to establish the accurate useful lives of the equipment. The BTA did not accept the Iowa curves. We read the record and found no description of how the curves were developed or why Connolly used the curves he did. Connolly could not explain the formula or the nature of its calculation. "That's up to my computer programmer. We gave him the information, he developed it." The BTA also found the disposal study to be too narrow in the data it studied. The BTA did not abuse its discretion in failing to grant Connolly's testimony credibility or his reports any weight. Moreover, Campbell did not present sufficient, competent, and probative evidence to

8

overcome the presumption of correctness that the commissioner's determination of value possesses.

{¶ 29} As to the cross-appeal, the commissioner argues that the BTA selected the average salvage value as the floor value of the equipment, thus undervaluing the property. Campbell replies that Connolly's study showed that "5.31% of the original cost of the property could be recovered on disposition." We agree with the commissioner.

{¶ 30} The 302 Computation describes the floor value as the minimum acceptable value. Beneath the "Tables for Determining True Value," which sets forth the depreciation allowances, the commissioner has written:

"The lowest percentage in each class determines the minimum acceptable value so long as property is held for use in business."

{¶ 31} This language compares with the definition of "residual value" found in Siegel & Shim, Dictionary of Accounting Terms (1987) 362:

"3. Value of a depreciable asset after all allowable depreciation has been taken."

{¶ 32} The same dictionary, at 375, defines "salvage value" as:

"[E]xpected price for a fixed asset no longer needed in business operations; also called SCRAP VALUE."

{¶ 33} The floor value, "the minimum acceptable value so long as property is held for use in business," equals the residual value of the assets, not their salvage value. Connolly, to determine his proposed floor value of 5.31 percent, divided the proceeds from sales of assets disposed of in 1992 by a "current cost new" amount for these assets. He derived this current cost new by applying an "index factor" to the amount capitalized for these sold assets. Connolly called the proceeds from sales of disposed assets their "recovery amount." The BTA, after reviewing this study, concluded that, "Mr. Connolly's studies support that the personal property has little salvage value."

**{¶ 34}** This recovery amount sounds very much like the salvage value, the "expected price for a fixed asset no longer needed in business operations," not the residual value described by the commissioner in the 302 Computation. Consequently, Connolly determined the salvage value of Campbell's equipment; he did not determine its floor value. Thus, the evidence the BTA relied on was not probative of the finding it was to make. The BTA erred in this reliance.

**{¶ 35}** Accordingly, as to the appeal, we hold that the BTA's decision is reasonable and lawful and affirm it. As to the cross-appeal, we hold that the BTA's decision is unreasonable and reverse it.

*Decision affirmed in part*
*and reversed in part.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents and would affirm the Board of Tax Appeals in toto.

––––––––––––––––––